J-S37021-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE SANCHEZ-RODRIGUEZ | : | |
| | : | |
| Appellant | : | No. 26 EDA 2023 |

Appeal from the Judgment of Sentence Entered November 29, 2022
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0001347-2021

BEFORE: BENDER, P.J.E., MURRAY, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:                    **FILED APRIL 1, 2024**

Jose Sanchez-Rodriguez ("Sanchez-Rodriguez") appeals from the judgment of sentence imposed after a jury found him guilty of drug delivery resulting in death, multiple counts of conspiracy and possession with intent to deliver a controlled substance, and related offenses.[1] We affirm.

Sanchez-Rodriguez's convictions arise from the investigation into the August 2019 overdose death of Edward Blew ("Blew") at his home in Monroe County. An autopsy determined that Blew overdosed on methamphetamines, heroin, and fentanyl. *See* N.T., 8/29/22, at 58; N.T., 8/30/22, at 23. The investigation initially focused on Blew's housemate, Brittany Vanhouwe ("Vanhouwe"), who had been arrested and charged previously for a different overdose death, and in whose room troopers found logs of drug transactions and other paraphernalia, including yellow baggies, which were also found in

_____

[1] *See* 18 Pa.C.S.A. §§ 2506, 903(a); 35 P.S. § 780-113(a)(30).

Blew's room. *See* N.T., 8/25/22, at 178-92. From a review of the logs, the lead investigator, Trooper Nicholas De La Iglesia ("Trooper De La Iglesia"), suspected that Vanhouwe's suppliers were individuals known as "Smoke" and "Harry," and that Vanhouwe had given Blew methamphetamines on the day of his death. *See id*. at 185-87. Trooper De La Iglesia noted there were used yellow baggies in a trash can in Vanhouwe's room, but troopers did not recover or preserve the used baggies as evidence. *See id*. at 178. He added that he had not seen yellow baggies before this investigation. *See* N.T., 8/30/22, at 106.[2] In September 2019, troopers arrested Vanhouwe on a bench warrant. *See* N.T., 8/25/22, at 193-94.

In October 2019, approximately seven weeks after Blew's death, police in Salisbury Township, Lehigh County, stopped Sanchez-Rodriguez for a traffic violation and arrested him after observing marijuana and yellow baggies in the car (the "October 2019 arrest"). *See* N.T., 8/26/22, at 57-59. Salisbury Township police searched the car and recovered: suspected methamphetamines and suboxone; digital scales; approximately $3,000 in cash; over 200 additional yellow baggies, some bundled in a black rubber band; and several cellphones, including two phones with a phone number ending -8448 ("the -8448 phones"). *See id*. at 58-70; N.T., 8/29/22, at 116,

_____

[2] We note that the witnesses, the attorneys, and the trial court used different terms, at different times, for the small yellow bags at issue in this appeal. Because the parties and the trial court have not established any meaningful distinction between terms such as wax or glassine, we use the term yellow baggies for the purpose of consistency in this decision.

143; N.T., 8/30/22, at 36-37, 39, 66. Testing confirmed that Sanchez-Rodriguez was in possession of methamphetamines and revealed that some of the yellow baggies contained a mixture of heroin and fentanyl. *See* N.T., 8/29/22, at 115-16.

Meanwhile, during his continuing investigation of Blew's death, Trooper De La Iglesia obtained a search warrant for Vanhouwe's phone, and the search revealed she had contact information for "Smoke," or "JajoSmoke" at a number ending in -8448. *See* N.T., 8/25/22, at 195; N.T., 8/29/22, at 9. Vanhouwe became a cooperating witness in exchange for a plea offer from the Commonwealth. *See* N.T., 8/29/22, at 6. During a proffer session, Vanhouwe gave a physical description of "Smoke" and stated she believed his name was Joseph or Jose Ramirez and he was a Latin King; however, she did not mention that "Smoke" had tattoos. *See id*. at 28-29; N.T., 8/30/22, at 57-58, 60-61. Trooper De La Iglesia used the information provided by Vanhouwe to contact other law enforcement agencies, and he received a tip concerning Sanchez-Rodriguez's October 2019 arrest. *See* N.T., 8/30/22, at 61. The trooper requested from Salisbury Township the evidence from the October 2019 arrest and obtained a search warrant for the phones taken after that arrest. *See id*. at 61-62. Investigators recovered information that the -8448 phones were among those phones, Sanchez-Rodriguez used the -8448 phones, and information about an email account using the username "slmbli0nheart." *See id*. at 37-38. Messages and location data obtained from the -8448 phones and the "slmbli0nheart" user account corroborated Vanhouwe's accounts of

specific drug transactions she had with "Smoke." *See id*. at 37-39, 50-53, 134-52; *see also* Commonwealth's Exhibit 66 (mapping, *inter alia*, movements of the "slmbli0nheart" account).

In April 2021, the Commonwealth charged Sanchez-Rodriguez with the above-stated offenses. The Commonwealth alleged that Sanchez-Rodriguez, Vanhouwe, another individual identified as Harry Read, and others, had engaged in conspiracies to deliver methamphetamines, heroin, and fentanyl between August and September 2019, and Sanchez-Rodriguez was a principal, accomplice, or coconspirator in delivering the drugs that killed Blew. *See* Information, 7/21/21, unnumbered at 1-2. The Commonwealth subsequently filed a notice of its intent to introduce evidence of other bad acts, including the evidence of drug trafficking and gang-related memorabilia recovered from Sanchez-Rodriguez's October 2019 arrest. *See* Notice of Commonwealth's Intention to Introduce Evidence of Crimes, Wrongs, or Other Acts, 7/27/22, unnumbered at 1. Sanchez-Rodriguez filed a motion *in limine* to preclude any evidence from the October 2019 arrest and his membership in a gang. *See* Sanchez-Rodriguez's Motion *in Limine*, 8/16/22, at 2-3. The trial court deferred ruling on the motion *in limine*. *See* Order, 8/23/22, at 1.

Of significance to this appeal, at trial, the court overruled Sanchez-Rodriguez's objections to the admission of evidence from the October 2019 arrest. *See* N.T., 8/26/22 at 45-48. The trial court did not expressly rule on the admissibility of gang-related evidence, and the Commonwealth did not present such evidence. However, after Sanchez-Rodriguez cross-examined

Vanhouwe about her descriptions of "Smoke" during her proffer, the court agreed with the Commonwealth that the defense opened the door to testimony that Vanhouwe told Trooper De La Iglesia that "Smoke" was a Latin King. *See* N.T., 8/29/22, at 31-37. Subsequently, the trial court overruled Sanchez-Rodriguez's objection to the Commonwealth's presentation of expert evidence, through the testimony of Special Agent Christopher Orozco ("Agent Orozco"), concerning the history and organization of the Latin Kings; the gang's use of gold/yellow and black colors; and how Sanchez-Rodriguez's use of those same colors, the crown tattoo on his hand, and the term "lion" in the "slmbli0nheart" email address linked him to the gang. *See* N.T., 8/30/22, at 113-18, 122-26.

The jury found Sanchez-Rodriguez guilty of all charges, and the trial court sentenced him to an aggregate term of thirty-seven to seventy-four years of imprisonment. Sanchez-Rodriguez filed a timely post-sentence motion, which the trial court denied. This timely appeal followed, and both Sanchez-Rodriguez and the trial court have complied with Pa.R.A.P. 1925.

Sanchez-Rodriguez presents the following issues for our review:

[1.] Did the trial court err in allowing testimony relating to . . . Sanchez-Rodriguez's subsequent narcotics arrest in another county during the trial?

[2.] Did the trial court err in allowing testimony relating to . . . Sanchez-Rodriguez's gang affiliations during the trial?

Sanchez-Rodriguez's Brief at 2-3 (some capitalization omitted).

Both of Sanchez-Rodriguez's issues implicate the trial court's evidentiary rulings, and more specifically, the trial court's determinations that the evidence from the October 2019 arrest, as well as the evidence concerning Sanchez-Rodriguez's gang affiliation, was relevant and not unduly prejudicial.

"It is well settled that evidentiary rulings are within the sound discretion of trial courts. Accordingly, when a party adverse to a trial court's evidentiary ruling seeks appellate review of that determination, that party carries a heavy burden to demonstrate that the trial court abused its discretion." *Commonwealth v. DiStefano*, 265 A.3d 290, 297 (Pa. 2021) (internal citations omitted). "An appellate court will not find an abuse of discretion based on a mere error of judgment, but rather . . . where the trial court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." *Id*. at 298 (internal citation, brackets, and quotations omitted).

"The threshold inquiry with admission of evidence is whether the evidence is relevant. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence." *Commonwealth v. Yale*, 249 A.3d 1001, 1022 (Pa. 2021) (internal citations and quotations omitted).

Pennsylvania Rule of Evidence 404 generally provides that other bad acts evidence is inadmissible to show that a defendant acted in conformity with those other acts or to show criminal propensity. *See* Pa.R.E. 404(b)(1).

However, other bad acts evidence may be admissible to prove a relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident. **See** Pa.R.E. 404(b)(2).[3] Rule 404(b)(2)'s list of potentially relevant facts is not exhaustive. **See** Pa.R.E. 404, Comment.

In a criminal case, other bad acts evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice. **See** Pa.R.E. 404(b)(2). "Unfair prejudice means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." **Commonwealth v. Tyson**, 119 A.3d 353, 360 (Pa. Super. 2015) (*en banc*) (internal citation and quotations omitted). When examining the potential for unfair or undue prejudice, a cautionary jury instruction may ameliorate the prejudicial effect of the proffered evidence. **See id**.

Sanchez-Rodriguez first argues that the trial court abused its discretion in admitting evidence concerning his October 2019 arrest. **See** Sanchez-Rodriguez's Brief at 12-14. He asserts the evidence obtained from his October 2019 arrest was improper propensity evidence, *i.e.*, that because he possessed controlled substances in October 2019, he must have possessed them in August 2019. **See id**. at 13. He acknowledges that the evidence from his October 2019 arrest included yellow baggies similar to the baggies

---

[3] Rule 404(b)(2) does not distinguish between prior bad acts and subsequent bad acts, such as the October 2019 arrest at issue in this appeal. **See Commonwealth v. Wattley**, 880 A.2d 682, 685 (Pa. Super. 2005).

found at Blew's home after Blew's overdose. *See id*. However, he contends that the prejudicial effect of that evidence outweighed its probative value because troopers failed to preserve all of the yellow baggies from Blew's home and the Commonwealth relied solely on Trooper De La Iglesia's testimony that the baggies found in Sanchez-Rodriguez's car in October 2019 were similar to the ones he observed in Blew's home in August 2019. *See id*.

The trial court explained that it admitted the evidence from Sanchez-Rodriguez's October 2019 arrest because it was relevant to identity. *See* Trial Court Opinion, 2/17/23, at 4-5. The court reasoned that the yellow baggies found in October 2019 "matched the bag[gies] found at the scene of [Blew's] death." *Id*. at 5. The court added it considered the potential prejudicial effect of admitting the evidence from the October 2019 arrest and instructed the jury on the proper uses of the evidence pursuant to its ruling. *See id*.; *see also* N.T., 8/31/22, at 68 (indicating, *inter alia*, the court charged the jury that it "must not regard this evidence as showing that [Sanchez-Rodriguez] is a person of bad character or criminal tendencies for which you might be inclined to infer guilt").

Following our review, we discern no abuse of discretion in the trial court's decision that the evidence from the October 2019 arrest was admissible. Police witnesses testified that they had not seen yellow baggies before investigating Blew's death, but such baggies were found at Blew's home in August 2019, when Blew overdosed, and in the car Sanchez-Rodriguez was driving at the time of his October 2019 arrest. *See* N.T., 8/30/22, at 106

(noting Trooper De La Iglesia's testimony he had never seen yellow baggies before); *see also* N.T., 8/29/22, at 143 (indicating testimony from a Commonwealth's expert witness that this case was the first time he saw yellow baggies to package drugs because most baggies for heroin or fentanyl were white). Vanhouwe further testified that the heroin she received from "Smoke" was packaged in yellow baggies, and she sold those baggies to others. *See* N.T., 8/29/22, at 18, 22. Therefore, the evidence of the yellow baggies connected Sanchez-Rodriguez to the conspiracies with Vanhouwe and others to possess drugs with the intent to deliver, and his specific role in supplying the drugs that contributed to Blew's death. *See* Trial Court Opinion, 2/17/23, at 4-5. To the extent Sanchez-Rodriguez argues that troopers did not preserve all of the yellow baggies from Blew's home for comparison to those from the October 2019 arrest, that assertion goes to the weight, not the admissibility, of the evidence from the October 2019 arrest under Rule 404. Moreover, the court clearly considered the probative value of the evidence from the October 2019 arrest against its potential prejudice and specifically instructed the jury not to use the evidence from the October 2019 stop to infer guilt based on bad character or propensity. *See* N.T., 8/31/22, at 68. Thus, we conclude that the trial court properly determined that the evidence from the October 2019 arrest had a proper evidentiary purpose and the probative value of the evidence outweighed its prejudicial effect.

Although not discussed by the trial court, we add that the quantity of paraphernalia, cash, and the types of drugs found as a result of the October

2019 arrest had probative value in determining whether Sanchez-Rodriguez had access to sufficient quantities of heroin and fentanyl, as well as access to methamphetamines, and to corroborate that he was the same "Smoke" Vanhouwe identified as her primary supplier of heroin between August and September 2019. Salisbury Township officers, moreover, seized phones, including the -8448 phone, as a result of the October 2019 arrest, and those phones yielded additional evidence connecting Sanchez-Rodriguez to specific sales to Vanhouwe. Based on this record, we conclude Sanchez-Rodriguez's claim that the probative value of the evidence from his October 2019 arrest did not outweigh its unfair prejudice lacks merit. *See Tyson*, 119 A.3d at 360; *see also* N.T., 8/26/22, at 58-70, 148, 153, 156-57, ; N.T., 8/29/22, at 26, 115-116; N.T., 8/30/22, at 36-37, 39, 66, 134-52. Accordingly, no relief is due.

In his next issue, Sanchez-Rodriguez argues that the trial court abused its discretion in permitting the Commonwealth to present evidence concerning his gang affiliation to the Latin Kings. *See* Sanchez-Rodriguez's Brief at 14-17.

A review of the record provides the following context to this issue. After the Commonwealth filed its pretrial notice of intent to present evidence of Sanchez-Rodriguez's gang affiliation, and Sanchez-Rodriguez opposed such evidence, the trial court deferred ruling on the admissibility of the evidence. *See* Notice of Commonwealth's Intention to Introduce Evidence of Crimes, Wrongs, or Other Acts, 7/27/22, unnumbered at 1; Sanchez-Rodriguez's

Motion *in Limine*, 8/16/22, at 2-3; Order, 8/23/22, at 1; N.T., 8/25/22, at 6-7; **see also** N.T., 8/26/22, at 76-78. The Commonwealth, therefore, initially proceeded without presenting gang-related evidence.

The Commonwealth then presented testimony from Vanhouwe, and she detailed how she initially met "Smoke" to supply her with heroin and described actual meetings with Smoke to purchase heroin. **See** N.T., 8/26/22, at 147-55; N.T., 8/29/22, at 11-12, 16-18. Vanhouwe identified Sanchez-Rodriguez at trial as the person she knew as "Smoke." **See** N.T., 8/29/22, at 23. During cross-examination, Sanchez-Rodriguez, through counsel, challenged the reliability of Vanhouwe's identification of Sanchez-Rodriguez as "Smoke." **See id**. at 27-29. Referring to Vanhouwe's proffer session with the Commonwealth, counsel elicited her testimony that she believed "Smoke's" actual name was Joseph Ramirez and that she did not mention that "Smoke" had any tattoos. **See id**.[4] Before beginning its redirect examination, the Commonwealth informed the court that during Vanhouwe's proffer session, she identified Smoke as a Latin King, and it argued Sanchez-Rodriguez opened the door to the evidence of his gang affiliation by challenging the reliability of her identification and emphasizing her failure to mention that "Smoke" had tattoos. **See id**. at 31-35. The trial court agreed, and the Commonwealth elicited Vanhouwe's testimony that, during her proffer session, she stated

---

[4] It was apparent that Sanchez-Rodriguez had visible tattoos on his arm and hand. **See** N.T., 8/29/22, at 34-35 (indicating counsel's and the trial court's observations during trial that Sanchez-Rodriguez had obvious tattoos).

Smoke was a Latin King. *See id*. at 35-37. Later, the court permitted Trooper De La Iglesia to testify that Vanhouwe had told him "Smoke" was a Latin King. *See* N.T., 8/30/22, at 61. Trooper De La Iglesia used that information, along with other information Vanhouwe provided about "Smoke," to locate information about the October 2019 arrest. *See id*.

Next, the Commonwealth proffered that it would present testimony from Agent Orozco regarding the Latin Kings and Sanchez-Rodriguez's uses of the gang's colors and symbols. *See id*. at 113-16. Sanchez-Rodriguez objected, arguing that the testimony was irrelevant and highly prejudicial, and the Commonwealth was offering the testimony to paint him as a bad person. *See id*. The trial court overruled Sanchez-Rodriguez's objection, noting that the testimony was relevant to connect him to the yellow baggies, the drugs found at Blew's home, and the ""slmbli0nheart" email address, which investigators used to link Sanchez-Rodriguez to sales to Vanhouwe. *See id*. at 117. The court gave the jury a cautionary instruction, and Agent Orozco thereafter testified concerning the history and structure of the Latin Kings, the local chapters of the gang being known as "tribes," the use of gold/yellow and black colors, and other symbols related to the gang. *See* N.T., 8/30/22, at 118-19, 122-26. Agent Orozco identified a picture of a crown tattoo on Sanchez-Rodriguez's hand as Latin King symbol, testified the use of "li0n" in the email "slmbli0nheart" username was consistent with the local "lion tribe" of the Latin Kings, and opined that the yellow baggies, in conjunction with black rubber bands, was consistent with the colors of the Latin Kings. *See id*. at 125-26.

On appeal, Sanchez-Rodriguez asserts that the trial court abused its discretion in allowing Vanhouwe's testimony that he was affiliated with the Latin Kings and Agent Orozco's testimony about the history, organization, colors, and symbols of the Latin Kings. *See* Sanchez-Rodriguez's Brief at 14-15. He asserts that unlike other cases where gang affiliation was relevant for purposes such as motive or to explain a witness's delay in reporting a crime, his affiliation with the Latin Kings had no relevant purposes to the charges. *See id*. at 14. Sanchez-Rodriguez claims that the sole purpose of this evidence was to establish he was a member of a gang and show his propensity to commit the charged crimes. *See id*. at 16. The charged conspiracies, he notes, involved Vanhouwe and other individuals, none of whom were alleged to be affiliated with the Latin Kings. *See id*. at 15. He contends that nothing about the history or organization of the Latin Kings had probative value to determine whether he committed the charged crimes. *See id*. at 15-16. The fact that Vanhouwe stated he was a Latin King during her proffer session, he argues, did not further Vanhouwe's identification of him as her supplier. *See id*. at 16.

The trial court concluded that Sanchez-Rodriguez opened the door to his gang affiliation by cross-examining Vanhouwe concerning the reliability of her identification and her failure, during her proffer session, to mention that Smoke had tattoos. *See* Trial Court Opinion, 2/17/23, at 6. The court further noted that it gave a cautionary instruction to the jury that the evidence concerning Sanchez-Rodriguez gang affiliation was to be used for the limited

purpose identifying Sanchez-Rodriguez. *See id*.; *see also* N.T., 3/19/22, at 118-19 (indicating that the trial court instructed the jury that the purpose of Agent Orozco's testimony was for identification and may not be considered to establish Sanchez-Rodriguez was guilty because he may or not be affiliated with a gang).

Following our review, we discern no abuse of discretion in the trial court's conclusion that Sanchez-Rodriguez opened the door to Vanhouwe's testimony that she had identified him as a Latin King during her proffer. Throughout trial, Sanchez-Rodriguez pursued a theory that Vanhouwe and investigators misidentified him as "Smoke." *See* N.T., 8/25/22, at 38-39. His counsel's cross-examination concerning the fact that Vanhouwe failed to mention tattoos during her proffer went to reliability of her identification, as well as the investigative measures subsequently taken by Trooper De La Iglesia. Although the trial court had previously deferred ruling on the admissibility of references to gang affiliation, further preclusion of the fact that Vanhouwe stated "Smoke" was a Latin King would have misled the jury and unduly limited its consideration of Vanhouwe's identification and the reliability of Trooper De La Iglesia's investigation. Thus, we discern no error in the trial court's conclusion that Sanchez-Rodriguez opened the door to Vanhouwe's testimony that she told investigators that "Smoke" was a Latin King. *See Commonwealth v. Murphy*, 182 A.3d 1002, 1005 (Pa. Super. 2018) (noting that "[a] litigant opens the door to inadmissible evidence by presenting proof

that creates a false impression refuted by the otherwise prohibited evidence") (internal citations and quotations omitted).

We also agree with the trial court's determination that Agent Orozco's testimony linking Sanchez-Rodriguez to the Latin Kings had probative value to connect Sanchez-Rodriguez to the yellow baggies found at Blew's home and the heroin and fentanyl ingested by Blew. Specifically, the evidence established that Sanchez-Rodriguez's possession and use of yellow baggies was not a mere happenstance but was consistent with his branding of himself as a Latin King. Moreover, the trial court clearly recognized and balanced the potential prejudice attendant the admission of the evidence, and we discern no basis to conclude that the court abused its discretion in finding its cautionary instruction was sufficient to balance the legitimate purposes of the evidence against its potential for prejudice. *Cf*. **Tyson**, 119 A.3d at 360. Thus, no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2024